# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **GEORGE EMILE JULY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-CV-0393-GKF-CDL** |
| | ) | |
| **SCOTT TINSLEY, Interim Warden,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

## AMENDED OPINION AND ORDER

Petitioner George Emile July petitions for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge the lawfulness of his custody under the criminal judgment entered against him in Tulsa County District Court Case No. CF-2013-5818.  He claims:  (1) he was denied his Sixth and Fourteenth Amendment rights to the assistance of counsel because trial counsel did not present sufficient evidence to support a voluntary intoxication defense and appellate counsel failed to adequately argue trial counsel's ineffectiveness in that regard (grounds one and two); and (2) he was denied his Fourteenth Amendment right to due process when the State of Oklahoma prosecuted him for major crimes he committed in Indian country because he is an Indian (ground three).  Dkts. 1, 6.  Respondent opposes the petition.  Dkt. 14.  Having considered the petition and supporting brief (Dkts. 1, 6), the response (Dkt. 14), Respondent's supplemental brief (Dkt. 19), the state court record (Dkts. 1-1, 1-2, 1-3, 14-1 through 14-15, 15-1 through 15-40, and 16), and applicable law, the Court finds and concludes that the petition shall be denied.

---

[1] July is incarcerated at the Dick Conner Correctional Center, and Scott Tinsley is the interim warden of that facility.  The Court therefore substitutes Scott Tinsley, Interim Warden, in place of Janet Dowling as party respondent.  Fed. R. Civ. P. 25(d); Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*.  The Clerk of Court shall note on the record this substitution.

## *BACKGROUND*

### I.    Factual background

In November 2013, Michelle Ashlock had been dating July since April 2013.  Dkt. 15-10 at 97-98.[2]  On November 9th, Ashlock visited Joseph and Stephanie Green at the Greens' Tulsa apartment.  *Id.* at 108; Dkt. 15-9 at 54-56, 116-18.  July arrived at the apartment around 10:30 p.m., driving a green car.  Dkt. 15-9 at 56-57, 60; Dkt. 15-10 at 111.  With him were Quinton Shaver and Christine Farar-Brown, both of whom had been with July at a house on Trenton Avenue in Tulsa, waiting for July to help Shaver cash a stolen check and helping July get some methamphetamine.  Dkt. 15-11 at 26-33.  July went inside the Greens' apartment while Shaver and Farar-Brown stayed in the car.  *Id.* at 33-34.  The Greens, July, and Ashlock sat in the Greens' bedroom talking and getting high.  Dkt. 15-9 at 56-57, 133-36; Dkt. 15-10 at 109-10.  The Greens and Ashlock used heroin, methamphetamine, or a mixture of these two drugs at the apartment; July used methamphetamine, or a mixture of methamphetamine and heroin before he arrived at the apartment.  Dkt. 15-9 at 57, 87-90, 133; Dkt. 15-10 at 109-10, 162.[3]  At some point, Ashlock left the apartment and drove her white car to a nearby QuikTrip to get cigarettes.  Dkt. 15-10 at 112.  When July realized Ashlock was gone, he asked Joseph if Ashlock had stolen anything from the

---

[2] Unless otherwise noted, the Court's citations refer to the CM/ECF pagination.

[3] Joseph Green testified he ingested a mixture of heroin and methamphetamine, that July "never touched the heroin," and that he and July "usually" ingest methamphetamine together, but he was not sure if July did so that night at the Greens' apartment.  Dkt. 15-9 at 87-90.  Stephanie Green testified that she ingested heroin either earlier in the day or in the evening when she was talking with Ashlock, and that Ashlock ingested methamphetamine.  *Id.* at 133.  Ashlock testified that the Greens "got high on heroin," that she asked to use heroin, and that she ultimately did not use heroin.  Dkt. 15-10 at 109-10, 162.  Ashlock also testified she used methamphetamine with July sometime before noon and before she went to the Greens' apartment.  *Id.* at 164.  Farar-Brown testified that July injected a "shot" of what she believed was "meth and heroin" while she, Shaver, and July were at the Trenton Avenue house before the trio drove to the Greens' apartment.  Dkt. 15-11 at 30-32, 76-77.

apartment and said he was going to find her. Dkt. 15-9 at 59. According to Farar-Brown, July returned to the green car with a gun, screaming "where did the bitch go?" Dkt. 15-11 at 34-35. July drove to QuikTrip and abruptly parked in front of Ashlock's car, nearly striking it. *Id.* at 35-36; Dkt. 15-10 at 113. July got out of the green car, began screaming at Ashlock, opened her car door, and began hitting her in the head with a gun. Dkt. 15-9 at 36; Dkt. 15-10 at 113-14. July pushed Ashlock into the passenger seat of the white car, sat down in the driver's seat, and drove back to the Greens' apartment. Dkt. 15-10 at 114-15. Farar-Brown and Shaver followed July to the apartment in the green car. *Id.* At some point, July called Joseph, stated he had found Ashlock, and further stated that he "was going to teach her a lesson." Dkt. 15-9 at 61. July parked Ashlock's white car in the Greens' driveway, slashed the tires of her car, forced Ashlock into the green car, and continued hitting her with a gun. Dkt. 15-10 at 115-18. July directed Farar-Brown to drive the green car to the Trenton Avenue house. *Id.* at 118; Dkt. 15-11 at 38.

When the foursome arrived at the Trenton Avenue house, July forced Ashlock into the house at gunpoint and dragged her down the hallway by her hair into a back bedroom where he repeatedly hit her with the gun and kicked her. Dkt. 15-10 at 119-22; Dkt. 15-11 at 38-39. Shaver and Farar-Brown sat in the living room, and Farar-Brown could hear July hitting Ashlock. Dkt. 15-11 at 40-42. At some point, July pounded on the door of another bedroom to wake Angel Proctor. *Id.* at 42. He told Proctor he had "some toys for her to play with." *Id.*; Dkt. 15-10 at 120. Proctor then joined July in beating Ashlock and cutting or poking her with a knife; July also hit Ashlock with a liquor bottle until the bottle broke. Dkt. 15-10 at 122-26. July directed Proctor to escort Shaver and Farar-Brown to the back bedroom, and she complied, leading the couple to the back bedroom at gunpoint. *Id.* at 126-28; Dkt. 15-11 at 43. When Shaver and Farar-Brown urged July and Proctor to stop beating Ashlock, July accused Farar-Brown of being a snitch and struck

Farar-Brown in the eye with a gun or a fist. Dkt. 15-10 at 129-30; Dkt. 15-11 at 44-46. July also struck Shaver in the face with a gun or a fist. Dkt. 15-10 at 129; Dkt. 15-11 at 47. While Ashlock and Farar-Brown sat in the corner of the room, they watched as July and Proctor continued to hit Shaver, stomp on his head, and beat him with a mop handle and a chair leg. Dkt. 15-10 at 130-36; Dkt. 15-11 at 47-54. Eventually, July strangled Shaver with a pair of jeans. Dkt. 15-10 at 131-32; Dkt. 15-11, at 207-09.

Throughout this time, July and Proctor were drinking whiskey, laughing, kissing, and taking turns kicking Ashlock and Farar-Brown in the head. Dkt. 15-10 at 122-30; Dkt. 15-11 at 44-54. July would leave the back bedroom periodically because he appeared concerned that someone was outside, July threatened to kill "all witnesses," the families of witnesses, and the police. Dkt. 15-10 at 134; Dkt. 15-11 at 55-59. At some point, July and Proctor shared a marijuana joint. Dkt. 15-10 at 135. July also staggered around the room and passed out more than once. *Id.* at 137-40. When he woke from briefly passing out, he accused Proctor of releasing "the other three hostages" and Proctor assured him that everyone was still in the bedroom. *Id.* at 139. July also appeared to be hallucinating, and Proctor asked Ashlock if July often sees people that are not there. *Id.* at 140. Ashlock replied she previously had seen July talk to his dead parents. *Id.* at 141. At some point, July passed out next to Shaver, the latter of whom was bleeding profusely and barely breathing. Dkt. 15-10 at 140; Dkt. 15-11 at 59. When Proctor could not rouse July, she became frantic. Dkt. 15-10 at 140; Dkt. 15-11 at 60. Ashlock told Proctor that July would kill everyone if they were there when July woke up. Dkt. 15-10 at 141-42. Proctor then escorted Ashlock and Farar-Brown to the green car, at gunpoint, and directed Ashlock to drive to Tahlequah. Dkt. 15-10 at 142-44; Dkt. 15-11 at 60-64. According to Ashlock, Proctor had three guns in her lap and, "started tripping and getting all weirded out," and stated she felt "funny." Dkt.

4

15-10 at 146.  Ashlock saw Proctor "pull[] out what [July] handed to her, which was a needle, with whatever in it and [Proctor] started freaking out."  *Id.*  When the trio reached Tahlequah, they went to the home of Proctor's friend where Proctor searched through duffel bags she had taken from the Trenton Avenue house, looking for items that she could sell, and went outside to burn "some phones and stuff."  Dkt. 15-10 at 147-50; Dkt. 15-11 at 60-64; Dkt. 15-37 at 22.

On the morning of November 10th, July called Joseph and asked him to drive to the Trenton Avenue house.  Dkt. 15-9 at 61-62.  When Joseph arrived, July told him not to touch anything, led him to the back bedroom, and showed him Shaver's body.[4]  *Id.* at 63-64.  Joseph asked July if Shaver was dead, and July said, "yes."  *Id.* at 78.  When Joseph asked July if he shot Shaver, July said, "no, he was beat to death."  *Id.* at 148.  July also told Joseph he "fucked up," that "things kind of got out of control," that there had been some beatings, and that he had passed out after taking a Xanax.  *Id.* at 65, 79, 94, 109-11.  July told Joseph he did not know what happened to Ashlock and Farar-Brown, but he feared Proctor had taken them away.  *Id.* at 65-67, 111-12, 140-41.  July gathered up his belongings, and Joseph drove July back to the Greens' apartment.  *Id.* at 65-67.  Joseph and Stephanie later returned to the Trenton Avenue house with July, and Stephanie saw Shaver's body in the back bedroom.  *Id.* at 67-70, 97, 121-23.

Later that afternoon, and unbeknownst to July, the Greens called a law enforcement officer to report that they had seen Shaver's body at the Trenton Avenue house.  Dkt. 15-9 at 73-76, 125-29, 146-49.  A team of law enforcement officers surveilled the Greens' apartment, the Trenton Avenue house, and a nearby McDonald's where July's white truck was parked.  *Id.* at 150-52.  At the Greens' apartment, officers watched July load items into a dark-colored truck, followed the

---

[4] Shaver was declared dead around 8:00 p.m. on November 10th and the medical examiner who performed his autopsy determined that he died from a combination of multiple blunt impact injuries and asphyxia due to strangulation.  Dkt. 15-11 at 227-28.

truck after it left the apartment, and arrested July after a brief vehicle pursuit and foot chase.  *Id.* at 152-57, 165, 199-214, 217-29.  In a search incident to July's arrest, officers recovered several items from July's person, including a handgun and methamphetamine, and found inside his wallet a handwritten list of cleaning supplies and identification cards belonging to Proctor and Shaver. *Id.* at 217-29; Dkt. 15-24 at 1-6; Dkt. 15-10 at 42-46, 216-18; Dkt. 15-33 at 2.

After they learned of July's arrest, Ashlock and Farar-Brown drove the green car back to Tulsa, without Proctor, and the two were interviewed the next day by law enforcement officers. Dkt. 15-10 at 152-57.  During a post-arrest interview, July initially denied knowing Proctor, Ashlock, Shaver, and Farar-Brown; having ever been to the Trenton Avenue house; being in the truck that was followed and pursued by law enforcement officers; having a gun on him when he was arrested; and committing any crimes.  Dkt. 15-11 at 165-75.[5]  Eventually, July offered detectives "multiple stories with different individuals involved in each story"; admitted he had been dating Ashlock, he knew Proctor, and he had been at the Trenton Avenue house "drinking and drugging"; and maintained that he was not involved in beating anyone or in killing Shaver. *Id.* at 165-75, 185-86.  Forensic analysis revealed an exceedingly high probability that Shaver's blood and DNA were found on the shoes and sweatshirt July was wearing when he was arrested. Dkt. 15-10 at 239-40, 246, 278-89.

## II.    Procedural background

Following a trial, a jury found July guilty of murder in the first degree; three counts of kidnapping; two counts of assault and battery with a deadly weapon; possession of a firearm after former conviction of a felony; and possession of a controlled dangerous substance.  Dkt. 1-3 at 1.

---

[5] July's videotaped interview was not admitted at trial, but one of the interviewing detectives testified about statements he made during the interview.  Dkt. 15-11 at 165-75, 247-48

The jury recommended life without the possibility of parole on the murder count and life imprisonment on all other counts. *Id.* The trial court sentenced July accordingly and ordered all counts to be served consecutively. *Id.*

July appealed to the Oklahoma Court of Criminal Appeals ("OCCA"), raising six claims. Dkt. 14-1. Relevant to this proceeding, July claimed trial counsel provided constitutionally deficient representation by failing to present sufficient evidence to support a voluntary intoxication defense. Dkt. 14-1, at 19-20. He requested an evidentiary hearing to develop this claim. Dkt. 14-2. The OCCA denied July's request for an evidentiary hearing, denied relief as to all claims, and affirmed his convictions and sentences. Dkt. 1-3 at 22. July did not seek further direct review by filing a petition for writ of certiorari in the United States Supreme Court ("Supreme Court"). Dkt. 1 at 3. July's state criminal judgment became final in 2016. Dkt. 1-1 at 6.

July applied for postconviction relief, asserting two claims.[6] Dkt. 14-5. First, July claimed that the State lacked jurisdiction to prosecute him because he is an enrolled member of the Muscogee (Creek) Nation with some degree of Creek blood, and crimes he committed within the Cherokee Nation Reservation are subject to federal criminal jurisdiction under the Major Crimes Act, 18 U.S.C. § 1153 ("MCA"). *Id.* at 11-20. Second, July claimed appellate counsel provided constitutionally deficient representation by failing to "proffer any evidence to support" the ineffective assistance of trial counsel claim July raised on direct appeal. *Id.* at 21-28. The state district court denied relief as to both claims, July appealed, and the OCCA affirmed the denial of postconviction relief. Dkts. 14-11 through 14-14.

July now seeks federal habeas relief, and Respondent urges the Court to deny the petition. Dkts. 1, 6, 14.

---

[6] July's state postconviction counsel represents July in this proceeding.

## DISCUSSION

### I.    Legal standards

A federal court may grant habeas relief to a state prisoner if the prisoner shows that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). But the "prisoner must exhaust available state remedies before presenting his claim to a federal habeas court." 28 U.S.C. § 2254(b)(1)(A); *Davila v. Davis*, 582 U.S. 521, 527 (2017).[7] And the way the state court resolves the federal claim determines the scope of federal habeas review.

If the state court denies the federal claim after a merits adjudication, the prisoner must make a threshold showing that the state court's adjudication of the claim resulted in a decision that either (1) is "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or (2) is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). The prisoner "carries the burden of proof" in satisfying these standards. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2001). When a claim is subject to review under § 2254(d)(1), a federal court must determine (1) whether clearly established federal law—i.e., "something akin to [an] on-point holding[]" by the Supreme Court, exists and, if so, (2) whether the prisoner has shown that the state court either (a) decided the federal claim in a manner that is contrary to the Supreme Court's holding or (b) applied that law to the facts of the case in an objectively unreasonable manner. *House v. Hatch*, 527 F.3d 1010, 1015-19 (10th Cir. 2008). A state court decision is objectively unreasonable only if it "is so

---

[7] A state prisoner generally must file a federal habeas petition within one year of the date his or her criminal judgment became final, but the limitation period is tolled while a properly filed application for state postconviction or other collateral review is pending in state court. 28 U.S.C. § 2244(d)(1), (d)(2). Respondent concedes that July exhausted available state remedies and timely filed the petition. Dkt. 14 at 3.

obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). Under § 2254(d)(2), a prisoner must show that the state court's determination of the facts relevant to the federal claim is objectively unreasonable. *House*, 527 F.3d at 1015, 1019. But "[t]he standard for determining whether the state court's decision was based on an unreasonable determination of the facts 'is a restrictive one.'" *Frederick v. Quick*, 79 F.4th 1090, 1104 (10th Cir. 2023) (quoting *Grant v. Trammell*, 727 F.3d 1006, 1024 (10th Cir. 2013)), *cert. denied*, 144 S. Ct. 2634 (2024). A federal court "must defer to the state court's factual determinations so long as 'reasonable minds reviewing the record might disagree about the finding in question." *Smith v. Duckworth*, 824 F.3d 1233, 1241 (10th Cir. 2016) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).

If the state court denies the federal claim based on an independent and adequate state procedural rule, the prisoner has procedurally defaulted that claim for purposes of federal habeas review. *Davila*, 582 U.S. at 527; *Coleman v. Thompson*, 501 U.S. 722, 732 (1991), *modified on other grounds by Martinez v. Ryan*, 566 U.S. 1 (2012). A federal court may not review, much less grant relief on, a procedurally defaulted claim unless the prisoner first shows either cause for the procedural default and actual prejudice from the alleged constitutional error or that the federal court's failure to review the claim will result in a fundamental miscarriage of justice. *Davila*, 582 U.S. at 527; *Coleman*, 501 U.S. at 750; *see also McQuiggin v. Perkins*, 569 U.S. 383, 392-93 (2013) (discussing miscarriage of justice exception); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (discussing cause and prejudice).

Even if a prisoner either satisfies § 2254(d)'s preconditions to relief or makes the showings necessary to overcome the procedural default of a federal claim, the prisoner is not entitled to

federal habeas relief. *See Brown v. Davenport*, 596 U.S. 118, 134 (2022) ("While AEDPA announced certain new conditions to relief, it did not guarantee relief upon their satisfaction."). Rather, the federal court must review the claim de novo and, if the court finds a constitutional error, "must assess [its] prejudicial impact . . . under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)]." *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *see Fontenot v. Crow*, 4 F.4th 982, 1060-61 (10th Cir. 2021) (noting that federal courts apply de novo review when federal claims, including procedurally defaulted claims, "were not decided on the merits" in state court and that under de novo review "state-court factfinding still receives the benefit of the doubt under § 2254(e)(1)"). Under the *Brecht* standard, a federal court will grant habeas relief only if the court "is in grave doubt as to the harmlessness of an error that affects substantial rights." *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995). Ultimately, to obtain federal habeas relief, the prisoner "must . . . persuade a federal habeas court that 'law and justice require' relief." *Davenport*, 596 U.S. at 134 (quoting 28 U.S.C. § 2243).

## II.    Ineffective assistance of counsel (grounds one and two)

July claims he received constitutionally deficient legal representation at the trial and appellate levels. Dkt. 1 at 5, 7; Dkt. 6 at 15-24. He contends trial counsel was ineffective for failing "to call an expert witness on methamphetamine intoxication or psychosis, exacerbated by alcohol use." *Id.* at 17-24. July acknowledges that appellate counsel raised this claim on direct appeal, but he contends appellate counsel was ineffective for failing adequately present this claim and proffer evidence to support it. *Id.*

### A.    Clearly established federal law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. Amend. 6. The Supreme Court has

interpreted the Sixth Amendment, applicable to the states through the Fourteenth Amendment, as providing a criminal defendant with the right to the effective assistance of counsel. *See McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel."); *Gideon v. Wainwright*, 372 U.S. 335, 341-44 (1963) (reaffirming that the Sixth Amendment right to counsel is applicable to the states through the Fourteenth Amendment's Due Process Clause).    Typically, a defendant alleging constitutionally deficient representation must show: (1) "that counsel's representation fell below an objective standard of reasonableness"; and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).    "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In framing this as a two-part inquiry, the *Strickland* Court did "not establish mechanical rules." *Id.* at 696.  Rather, the *Strickland* Court emphasized that while the two-part inquiry "should guide" courts adjudicating ineffective assistance of counsel claims, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.*  The *Strickland* Court also recognized that courts may adjudicate these claims without addressing both components of the two-part inquiry, stating,

> there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.  In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Id.* at 697.

*Strickland*'s analytical framework also informs a court's adjudication of ineffective assistance of appellate counsel claims alleging deficiencies in appellate briefing. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Ordinarily, a court evaluating whether appellate counsel performed deficiently either by omitting or failing to adequately present an issue must "look to the merits of the omitted issue." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003) (quoting *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001)). And, in this context, an appellant must establish prejudice by "show[ing] a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal." *Robbins*, 528 U.S. at 285.

### B.    Additional facts and OCCA decisions

### 1.    Trial counsel's alleged ineffectiveness

Evidence presented at trial established that July ingested methamphetamine, possibly mixed with heroin, alcohol, and Xanax before and during the commission of the crimes for which he was convicted. *See supra*, background section I. Trial counsel requested an instruction on the defense of voluntary intoxication, citing this evidence and evidence that July experienced hallucinations and passed out at the Trenton Avenue house, but the trial court declined to give the instruction. Dkt. 15-11 at 125, 129-32, 276-84; Dkt. 15-12 at 14-18. Under Oklahoma law, a defendant asserting a voluntary intoxication defense must show: (1) the defendant was intoxicated and (2) the defendant "was 'so utterly intoxicated, that his mental powers [were] overcome, rendering it *impossible* for [him] to form the specific criminal intent . . . element of the crime.'" *Cuesta-Rodriguez v. State*, 247 P.3d 1192, 1195 (Okla. Crim. App. 2011) (alterations and emphasis in original) (quoting *Simpson v. State*, 230 P.3d 888, 899 (Okla. Crim. App. 2010)). In declining to give the instruction, the trial court reasoned:

> The evidence that was presented was that [July] was drinking, that there were pills present, but that there was no evidence that he took the pills. There was

> no evidence that . . . his intoxication reached a level that he was so utterly
> intoxicated[] that his mental powers were overcome rendering it impossible for him
> to form specific criminal intent.
>
> In fact, as I reviewed the testimony, there was not evidence of his level of
> intoxication. Albeit, there was testimony that the defendant staggered and hit a wall
> and woke up and passed out again. There's no evidence that that was subsequent
> or promulgated because of any injection of any intoxicant liquor or drugs.
>
> In fact, the testimony was clear from two items. It is that it appeared he
> knew exactly what he was doing when he was doing it with respect to the
> description of the assaults and the batteries that were testified to on the deceased.

Dkt. 15-12 at 16-17.

On direct appeal, July argued that Oklahoma law appears to "require" expert witness testimony to support a voluntary intoxication defense and that it was unreasonable for trial counsel not to call an expert witness who could testify about methamphetamine intoxication or psychosis exacerbated by alcohol use. Dkt. 14-1 at 19-25. July moved for an evidentiary hearing on this claim and, to support that request, submitted (1) the curriculum vitae of William H. Yarborough, M.D., and (2) and an affidavit from appellate counsel. Dkt. 14-2. Appellate counsel stated in his affidavit that: (1) he previously had retained Dr. Yarborough as an expert witness in a different case to testify about methamphetamine psychosis; (2) he lacked funds to retain Dr. Yarborough to interview July or review his case; (3) if granted an evidentiary hearing, he likely could "secure funds" to retain Dr. Yarborough who, in turn, might agree testify at the hearing; and (4) he believed that Dr. Yarborough "would be able to at least testify that the drug and alcohol intake of George July would have had an effect on his ability to form the specific intent to commit a crime in this case." *Id.* at 27-28.

The OCCA denied July's request for an evidentiary hearing and denied his claim that trial counsel was ineffective. Dkt. 14-4 at 9-13. The OCCA acknowledged that state law imposes a "high standard" for raising a voluntary intoxication defense and requires more than evidence of

"mere consumption" of alcohol or drugs or "conflicting evidence of a defendant's level of intoxication," but the OCCA rejected July's argument that state law requires a defendant to present an expert witness to support that defense. *Id.* at 9-10. Addressing July's application for an evidentiary hearing and considering the affidavits he submitted, the OCCA found that July did not "show . . . by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." *Id.* at 10. The OCCA cited the trial court's factual findings related to July's request for a voluntary intoxication instruction and reasoned:

> In light of the trial court's finding that [July] did not present a *prima facie* case of intoxication, [July's] failure to present any evidence in his motion to remand for evidentiary hearing concerning a diagnosable mental illness or any evidence of the substances and their amounts consumed by [July] at the time of the crime so as to render him utterly intoxicated and his mental powers were overcome rendering it impossible for him to form the specific criminal intent element of the crime[,] and the admitted inability to know what Dr. Yarborough would testify to regarding [July's] intent to commit the charged crimes dooms [July's] request for an evidentiary hearing. The information contained in the motion fails to present clear and convincing evidence that there is a strong possibility trial counsel was ineffective for failing to investigate and present further evidence in support of a voluntary intoxication claim. Having thoroughly reviewed [July's] application and affidavit, we conclude that [July] is not entitled to an evidentiary hearing on his claim of ineffective assistance of counsel.

*Id.* at 11-12. The OCCA then stated, "Regarding the claim of ineffectiveness raised in the appellate brief, [July] has not shown trial counsel to be ineffective under the more rigorous federal standard set forth in *Strickland* for ineffective assistance of counsel." *Id.* at 12.

### 2. Appellate counsel's alleged ineffectiveness

On postconviction appeal, July acknowledged that appellate counsel claimed trial counsel was ineffective for not hiring an expert witness or otherwise presenting a viable voluntary intoxication defense, but July argued that appellate counsel failed to present available evidence to support that claim. Dkt. 14-5 at 21-28. To support this argument, July submitted excerpts from

14

police reports, highlighting witness descriptions of his use of controlled substances and alcohol and his behavior on November 9, 2013; his own affidavit and an affidavit from his ex-wife, both signed in 2017, describing his abuse of controlled substances in the months leading up to November 2013 and his ex-wife's discussions with trial counsel about the possibility of hiring an expert witness; and an affidavit from Terese Hall, a licensed psychologist and board-certified forensic psychologist, who reviewed certain case materials, and opined that expert testimony about the effects of substance abuse "could have been helpful to the jury," that an expert "could have assessed the possibility of a substance-induced psychotic disorder," and that "there is a reasonable possibility that Mr. July could have been unable to form criminal intent because of the effects of methamphetamine and other substance ingestion on his mental processes, resulting in severe intoxication or drug-induced psychosis." *Id.* at 117-46.

Applying *Strickland*, the state district court denied relief. Dkt. 14-11 at 7-10. It reasoned, in part, that the affidavits from July and his ex-wife discussed July's "purported drug use and its effects prior to the date of the offenses," but did not "address the date of the offense itself," or "provide evidence of the substances and their amounts consumed by [July] at the time of the crime." Dkt. 14-11 at 10. Considering "the evidence presented by [July] in support of his application for post-conviction relief," the state district court found no "reasonable probability that had [July's] appellate counsel presented the evidence [July] claims counsel should have presented, the result of [July's] appeal would have been different." *Id.*

On postconviction appeal, the OCCA identified *Strickland* as providing the controlling legal principles to evaluate July's claim and denied relief, reasoning:

> [July] claims that trial counsel was ineffective for failing to present an intoxication defense and, in turn, appellate counsel was ineffective for failing to assert trial counsel's ineffectiveness. According to [July], prior counsel should have introduced evidence of his drug use and its effects on his behavior in support

15

of an intoxication defense. However, the District Court found that even if the information referenced by [July in his application for postconviction relief] had been presented, nothing would have changed. The District Court's conclusion is not an abuse of discretion. It follows that the District Court did not abuse its discretion when it rejected [July's] claim of ineffective assistance of appellate counsel. *See Logan*, 2013 OK CR 2, ¶ 11, 293 P.3d at 975 ("An assertion of ineffectiveness of appellate counsel based upon the failure to raise a meritless claim (or meritless claims) can be summarily rejected.").

Dkt. 14-14 at 3-4.

### C.    Analysis and conclusion

Respondent contends § 2254(d) bars relief as to both ineffective assistance of counsel claims because July has not shown that the OCCA's adjudication of those claims resulted in decisions, either on direct or postconviction appeal, that are objectively unreasonable. Dkt. 14 at 12, 20-31. The Court agrees.

Because the OCCA applied *Strickland* in rejecting both ineffective assistance of counsel claims, July must show that the OCCA's adjudication of his claims resulted in decisions that either (1) involve an unreasonable application of *Strickland*'s legal principles to the facts of his case or (2) are based on an unreasonable determination of the facts presented in state court. 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 406 (2000) (explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause"). On federal habeas review, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is . . . difficult" because "[t]he standards created by ʻand § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (cleaned up). And because *Strickland* provides a general rule for state courts to apply, "the range of reasonable applications is substantial." *Id.*

July barely references the standards that guide this Court's review of his claims and makes no discernible effort to satisfy them. Dkt. 6 at 15-24. Instead, he discusses *Strickland*, reasserts the arguments he presented in his application for postconviction relief, and appears to ask this Court to review one or both of his ineffective assistance of counsel claims de novo. *Id.* at 16-22. But the question for this Court is not whether either of his attorneys performed so deficiently as to prejudice the outcome of his trial and appeal; rather, the question for this Court is whether the OCCA had any reasonable basis to reject his ineffective assistance of counsel claims. *Richter*, 562 U.S. at 105.

July has not shown that the OCCA's decisions are "so obviously wrong" that no fairminded jurists would agree with them. *Kayer*, 592 U.S. at 118. To the extent July mentions the OCCA's decisions, he appears to contend both are objectively unreasonable because: (1) the OCCA "denied relief and an evidentiary hearing on the basis that appellate counsel failed to present evidence to support it"; (2) the state district court effectively disregarded the evidence July marshaled to support his ineffective assistance of appellate counsel claim; and (3) on postconviction appeal, the OCCA "did not engage in any analysis of the evidence presented by July, nor the opinion of Dr. Hall, but held simply and conclusory that the state district court decision [denying postconviction relief] was not an abuse of discretion." *Id.* at 23-24. In his closing sentence, July asserts that "[t]he opinions of the OCCA both on direct appeal and in denying post-conviction relief are objective unreasonable and July is entitled to habeas relief." *Id.* at 24.

None of these contentions is persuasive. First, July's "broad, conclusory statement" that the OCCA's decisions "are objective unreasonable" is "insufficient to carry [his] burden" to show that § 2254(d) does not bar relief. *Meek v. Martin*, 74 F.4th 1223, 1267 (10th Cir. 2023). Second, it is not clear from July's brief, which largely focuses on evidence marshaled for postconviction

proceedings, why it was objectively unreasonable for the OCCA to reject the ineffective assistance of trial counsel claim raised on direct appeal after considering the trial record and appellate counsel's speculations about what testimony Dr. Yarborough might offer if he were hired to testify at an evidentiary hearing. Dkt. 6 at 16-24. Moreover, July's argument that appellate counsel did not offer sufficient evidence to establish trial counsel's ineffectiveness directly undermines any argument July might be making that the OCCA unreasonably rejected his admittedly unsupported ineffective assistance of trial counsel claim. Third, the record belies July's contention that the state district court ignored the evidence he presented in his state postconviction proceeding to establish appellate counsel's ineffectiveness. Rather, the state district court considered that evidence and carefully explained why it did not support a finding that appellate counsel's allegedly deficient performance prejudiced the outcome of July's appeal. Dkt. 14-11 at 7-10. Fourth, to the extent July critiques the OCCA's postconviction decision based on the absence of specific references to the evidence that the state court had already carefully considered or the absence of "serious legal analysis" of his ineffective assistance of appellate counsel claim, July's criticisms do not come close to showing that the OCCA unreasonably applied *Strickland* or unreasonably determined the facts relevant to his claims. Critically, the Constitution does not require state courts to show their work in anticipation of federal habeas review. *See e.g.*, *Johnson v. Williams*, 568 U.S. 289, 300 (2013) (noting that "federal courts have no authority to impose mandatory opinion-writing standards on state courts"); *Coleman*, 501 U.S. at 739 ("[W]e have no power to tell state courts how they must write their opinions."). Even when "a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. July has not met that burden.

On the record presented, the Court finds and concludes that July has not met his initial burden to show that the OCCA's decisions on his ineffective assistance of counsel claims are objectively unreasonable, much less his ultimate burden to show that law and justice require this Court to grant federal habeas relief on those claims. The Court therefore denies the petition as to the claims asserted in grounds one and two.

## III.    Indian country jurisdiction (ground three)

July claims the State did not have jurisdiction to prosecute him because he is an enrolled member of the Muscogee (Creek) Nation with some degree of Indian blood and crimes he committed within the Cherokee Nation Reservation are enumerated in the MCA and thus subject to federal criminal jurisdiction. Dkt. 1 at 8; Dkt. 6 at 25-29.

### A.    Clearly established federal law

Under the MCA, only the federal government has jurisdiction to prosecute certain crimes, including murder, kidnapping and felony assault, that are committed by Indians within "Indian country." 18 U.S.C. § 1153(a); *see McGirt v. Oklahoma*, 591 U.S. 894, 932 (2020) ("[T]he MCA applies to Oklahoma according to its usual terms: Only the federal government, not the State, may prosecute Indians for major crimes committed in Indian country."); *id.* at 934 ("When Congress adopted the MCA, it broke many treaty promises that had once allowed tribes like the Creeks to try their own members. But, in return, Congress allowed only the federal government, not the States, to try tribal members for major crimes."); *see also* 18 U.S.C. § 1151 (defining "Indian country"); *United States v. Hatley*, ___ F.4th ___, 2025 WL 2553109, at * 7 (10th Cir. Sept. 5, 2025) (quoting the plain language of the MCA and stating "§ 1153 confers exclusive federal jurisdiction over '[a]ny *Indian who commits* against the person or property of another Indian or other person' any of the offenses enumerated in the statute" (emphasis in original)).

Because the relevant federal statutes do not define the term "Indian," federal courts apply a two-part test to determine if a criminal defendant is Indian.  That test requires a court to "make factual findings that the defendant '(1) has some Indian blood; and (2) is recognized as an Indian by a tribe or by the federal government.'"  *United States v. Prentiss*, 273 F.3d 1277, 1280 (10th Cir. 2001) (quoting *Scrivner v. Tansy*, 68 F.3d 1234, 1241 (10th Cir. 1995)).  In *Hatley*, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") held, as a matter of first impression in this circuit, that, "when proving a defendant's Indian status, the government can only satisfy the second prong of the *Prentiss II* test by proving beyond a reasonable doubt that the defendant was recognized as an Indian at the time of the charged offense."  *Hatley*, 2025 WL 2553109, at *8; *accord United States v. Zepeda*, 792 F.3d 1103, 1113 (9th Cir. 2015) (*en banc*) (holding that "the government must prove that the defendant was an Indian at the time of the offense with which the defendant is charged" to establish Indian status for purposes of federal prosecution under the MCA).

In this circuit, "[t]he issue of whether the state court properly exercised jurisdiction" over an Indian who committed major crimes in Indian country is "an important federal constitutional question" and the "[a]bsence of jurisdiction in the convicting court is . . . a basis for federal habeas corpus relief cognizable under the due process clause."  *Yellowbear v. Wyo. Atty. Gen.*, 525 F.3d 921, 924 (10th Cir. 2008) (citing Supreme Court precedent).[8]

---

[8] Respondent urges the Court to deny relief on July's Indian country jurisdiction claim, in part, because:  (1) "no Supreme Court law clearly establishes that federal prosecutorial authority under the MCA . . . is exclusive of state authority" and (2) "no Supreme Court law clearly establishes that a state prosecution in violation of the MCA . . . is redressable on habeas review."  Dkt. 14 at 39-63.  Based on the Court's foregoing discussion of clearly established federal law, the Court rejects these arguments.

## A.    Additional facts and OCCA decision

July raised his Indian country jurisdiction claim in his 2017 application for postconviction relief.  In support of this claim, July cited the MCA, *Solem v. Bartlett*, 465 U.S. 463 (1984), and *Murphy v. Royal*, 866 F.3d 1164 (10th Cir. Aug. 8, 2017), *amended and superseded on denial of reh'g by* 875 F.3d 896 (10th Cir. 2017) ("*Murphy I*"), *aff'd sub nom. Sharp v. Murphy*, 591 U.S. 977 (2020) ("*Murphy II*").  Dkt. 14-5, at 11-20.  In *Murphy I*, the Tenth Circuit considered a habeas petitioner's challenge to the State's allegedly improper exercise of criminal jurisdiction in Indian country that the petitioner first raised in state court through a second postconviction appeal.  875 F.3d at 907-09.  Applying *Bartlett*, the Tenth Circuit held that because Congress has not disestablished the Muscogee (Creek) Nation Reservation, the land within the boundaries of that reservation is "Indian country" for purposes of the MCA.  *Murphy I*, 875 F.3d at 966.[9]  In his application for postconviction relief, July asked the state district court to apply *Bartlett*'s framework to determine whether Congress had disestablished the Cherokee Nation Reservation and July attached several exhibits (e.g., maps and treaties) to aid the state district court in performing that task.  Dkt. 14-5 at 11-20, 32-35, 40-92.  July also attached exhibits showing that he has a degree of Indian blood and is an enrolled member of the Muscogee (Creek) Nation.  *Id.* at 36-39.  In March 2018, the State moved to abate July's state postconviction proceeding until the matter in *Murphy I* was "settled."  Dkt. 14-6 at 1.

In July 2020, the Supreme Court issued decisions in *McGirt* and *Murphy II*.  In *McGirt*, an Oklahoma prisoner petitioned the Supreme Court for a writ of certiorari to review the OCCA's

---

[9] The Tenth Circuit stayed issuance of the mandate in *Murphy I* for 90 days or until the deadline passed for filing a petition for writ of certiorari.  The respondent in that case filed a petition for writ of certiorari, and the Supreme Court granted that petition in May 2018.  *Royal v. Murphy*, 584 U.S. 992 (2018).

decision denying his application for postconviction relief. *See McGirt v. Oklahoma*, 140 S. Ct.
659 (2019) (granting petition for writ of certiorari). Like the habeas petitioner in *Murphy I*, the
prisoner in *McGirt* claimed that because he is an Indian, the federal government should have
prosecuted him for major crimes he committed within the boundaries of the Muscogee (Creek)
Nation Reservation. *McGirt*, 591 U.S. at 898 ; *Murphy I*, 875 F.3d at 928. The question presented
in *McGirt* was whether the land promised to the Muscogee (Creek) Nation through treaties signed
by the United States in 1832 and 1833 "remains an Indian reservation for purposes of federal
criminal law." 591 U.S. at 897. The *McGirt* Court held that because Congress did not disestablish
the Muscogee (Creek) Nation Reservation the land within the boundaries of that reservation is
"Indian country," as defined in 18 U.S.C. § 1151(a), and, as a result, the federal government has
exclusive jurisdiction, under the MCA, to prosecute certain crimes committed by Indians within
those boundaries. *McGirt*, 591 U.S. at 913, 933-34. Relying on its decision in *McGirt*, the
Supreme Court in *Murphy II* summarily affirmed the Tenth Circuit's decision in *Murphy I*. *Murphy
II*, 591 U.S. at 978. The *McGirt* Court recognized that its decision might "risk[] upsetting some
convictions" because Oklahoma had been prosecuting Indians for crimes committed in Indian
country since statehood, despite the "plain terms" of the MCA. 591 U.S. at 924-34. But the
*McGirt* Court reasoned that "[o]ther defendants who do try to challenge their state convictions
may face significant procedural obstacles, thanks to well-known state and federal limitations on
postconviction review in criminal proceedings." *Id.* at 932-33.

After the Supreme Court issued its decision in *McGirt*, July moved the state district court
for an order directing the State to respond to his 2017 application for postconviction relief, and the
matter was fully briefed in April 2021. Dkt. 14-7; Dkt. 14-11 at 1. Nearly one year later, the state
district court denied July's application. Dkt. 1-1. The state district court found that July became

an enrolled citizen of the Muscogee Creek Nation in November 2005, that he has a significant degree of Creek Blood, and that he committed his crimes within the Muscogee Creek Nation Reservation and/or the Cherokee Nation Reservation.[10]  *Id.* at 3.  Nonetheless, the state district court denied relief based on the OCCA's decision in *State ex rel. Matloff v. Wallace*, 497 P.3d 686 (Okla. Crim. App. 2021).  *Id.* at 5-7.  In *Wallace*, the OCCA "exercise[ed] [its] independent state law authority to interpret the remedial scope of the state post-conviction statutes" and held that the *McGirt* Court "announced a new rule of criminal procedure" and that the *McGirt* decision does not "apply retroactively in a state post-conviction proceeding to void a final conviction."  *Wallace*, 497 P.3d at 688-89, 694.  The state district court reasoned that *Wallace* precluded relief because July's conviction became final in 2016.  Dkt. 1-1 at 6-7.  July appealed, and the OCCA likewise relied on *Wallace* to affirm the denial of postconviction relief.  Dkt. 1-2 at 2-3.  The OCCA declined July's "invitation to revisit [its] holding in *Wallace*.  *Id.* at 3.[11]

---

[10]  While July's application for postconviction relief was pending, the OCCA held in a different case that the Cherokee Nation Reservation is Indian country, as defined in § 1151(a).  *Hogner v. State*, 500 P.3d 629, 635 (Okla. Crim. App. 2021), *overruled in part on other grounds by Deo v. Parish*, 541 P.3d 833 (Okla. Crim. App. 2023).

[11]  When the state courts adjudicated July's claim, neither state court suggested that he waived it by failing to raise it at the trial court level or on direct appeal.  *See* Dkts. 1-1, 1-2.  At that time, Oklahoma law provided that "subject matter jurisdiction cannot be waived and can be raised at any time" and state courts generally treated *McGirt*-based claims as implicating subject matter jurisdiction.  *See Deo v. Parish*, 541 P.3d 833, 835-38 (Okla. Crim. App. 2023).  In *Deo*, however, the OCCA concluded that "subject matter jurisdiction considers the type of controversy before the district court, not the parties, territory, or sovereigns at issue."  *Id.* at 838.  The OCCA stated that it was "no longer convinced that Congress has preempted Oklahoma State Courts' subject matter jurisdiction" and that it had "become[] clear that Congress has chosen to exercise its authority over a particular territory (Indian Country) and over a particular people (Indians), not a type of controversy, at most preempting Oklahoma's territorial and personal jurisdiction over Indians in Indian Country."  *Id.* at 837.  *See also, City of Tulsa v. O'Brien*, ___ P.3d ___, 2024 WL 5001684 (Okla. Crim. App. Dec. 5, 2024) (describing *Deo* as holding "that Indian country jurisdictional claims do not implicate Oklahoma district courts' subject matter jurisdiction, but rather personal and territorial jurisdiction").

### C.    Analysis and conclusion

Respondent urges the Court to deny relief on this claim, in part, because the OCCA's decision is based on an independent and adequate state procedural rule, namely the *Wallace* rule, and July has not made the showings necessary to overcome the procedural default of this claim. Dkt. 14 at 63-92.[12]  The Court agrees.

As previously discussed, when a state court denies a federal claim based on an independent and adequate state procedural rule, the prisoner has procedurally defaulted that claim for purposes of federal habeas review.  *Davila*, 582 U.S. at 527; *Coleman*, 501 U.S. at 732.  When "the state pleads the affirmative defense of an independent and adequate state procedural bar, the burden to place that defense in issue shifts to the petitioner." *Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999).  A state procedural rule is adequate if the rule is "firmly established and regularly followed." *Beard v. Kindler*, 558 U.S. 53, 60 (2009) (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).  And a state procedural rule is independent if the rule relies on state law, rather than federal law. *Simpson v. Carpenter*, 912 F.3d 542, 571 (10th Cir. 2018).  "[A]t a minimum," the petitioner must come forward with "specific allegations . . . as to the inadequacy of the state procedure" and "[t]he scope of the state's burden of proof thereafter will be measured by the specific claims of inadequacy put forth by the petitioner." *Id.*

July did not file a reply brief to respond to Respondent's argument that the *Wallace* rule provides an independent and adequate state law ground to support the OCCA's rejection of his Indian country jurisdiction claim.  However, in his brief, July presents several arguments regarding

---

[12] Alternatively, Respondent contends that § 2254(d) bars relief to the extent it states a cognizable habeas claim, and that this claim would fail on de novo review because it is barred by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).  Dkt. 14 at 92-133.  Because the Court agrees that this claim is procedurally barred, the Court declines to address these alternative arguments.

the *Wallace* rule. Generally, July "objects to the holding of *Wallace* and its application to his case, and views it as wrongly decided and in direct conflict with *McGirt*." Dkt. 6 at 26. More specifically, he contends "the OCCA is incorrect as a matter of federal law that *McGirt* announced a new rule of criminal *procedure*" because, in July's view, *McGirt* announced "a substantive rule of criminal law." *Id.* at 27 (emphasis in original). He further contends that because "Jimcy McGirt has received the benefit of the *McGirt* ruling," he should receive that same benefit to avoid being "singled out arbitrarily in violation of Due Process under the Fourteenth Amendment and the Equal Protection Clause." *Id.* Next, he contends imprisoning him, and other Native Americans, "when the State has no lawful power to do so violates . . . substantive Due Process." *Id.* He also contends "there is no rational or legal principle that says that *Wallace* itself must be applied retroactively" and emphasizes that the state district court did not rule on his 2017 application for postconviction relief until 2022. *Id.* at 27-28. Lastly, July contends the OCCA "has no authority to deem a decision of the Supreme Court retroactive or not" because "[t]hat power is left to the Supreme Court itself under the principles of retroactivity outlined in" *Teague*. *Id.* at 28-29.

Though not well developed, July's arguments appear to ask this Court to consider whether the OCCA wrongly decided *Wallace*. But that question is not before this Court in this habeas action. Because the OCCA rejected July's Indian country jurisdiction claim based on a procedural rule, without reaching the merits, the only questions for this Court are (1) whether the *Wallace* rule is independent of federal law; (2) whether the OCCA regularly follows it in denying postconviction relief; and (3) if so, whether July has shown that he can overcome the procedural default of this claim. July's arguments do not fairly address any of these questions. In contrast, Respondent shows that the OCCA has applied the *Wallace* rule in more than 350 cases since *Wallace* was decided. Dkt. 14 at 73; Dkts. 14-19, 14-20. On this record, the Court finds that the *Wallace* rule

is adequate because it is "firmly established and regularly followed." *Beard*, 558 U.S. at 60. The Court further finds that the *Wallace* rule is independent of federal law. True, the OCCA discussed federal law, including *Teague*, in reaching its decision that it would not retroactively apply *McGirt* to in state postconviction proceedings, but the OCCA also clearly expressed that its ultimate decision on that issue rests on independent state law grounds. *Wallace*, 497 P.3d at 688-89, 694. Under Supreme Court precedent, that clear expression is sufficient to establish that the *Wallace* rule is "independent" of federal law. *See Michigan v. Long*, 463 U.S. 1032, 1041 (1983) ("If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached."); *Simpson*, 912 F.3d at 571.[13] In sum, the Court finds that the OCCA applied an independent and adequate state procedural rule to deny postconviction relief on July's Indian country jurisdiction claim, resulting in a procedural default of this claim.

To obtain habeas review of this claim, July first must show either cause for the procedural default and actual prejudice from the alleged constitutional error or that this Court's failure to review the claim will result in a fundamental miscarriage of justice. *Davila*, 582 U.S. at 527; *Coleman*, 501 U.S. at 750. July neither acknowledges the procedural default of this claim nor attempts to show that he can overcome the procedural default. Instead, July's arguments focus on

---

[13] At least two federal district judges in Oklahoma, including the undersigned, previously have concluded that the OCCA's *Wallace* rule is an independent and adequate procedural rule that, when applied to a federal claim challenging the state's allegedly improper exercise of criminal jurisdiction in Indian country, results in a procedural default of that federal claim. *See Patterson v. Harpe*, No. 18-CV-0153-GKF-JFJ, 2025 WL 1908975, at *16 (N.D. Okla. July 10, 2025) (slip copy); Dkt. 19-1, *Fitzer v. Hamilton*, No. CIV-18-283-RAW-GLJ (E.D. Okla. Jan. 2, 2025) (unpublished). While neither case is binding on this Court, the Court finds the reasoning in *Patterson* and *Fitzer* persuasive.

the merits of his Indian country jurisdiction claim and assert that the OCCA wrongly decided *Wallace*. Dkt. 6 at 25-29.[14]

Because July procedurally defaulted the Indian country jurisdiction claim and has not shown any basis for this Court to excuse the procedural default, the Court denies the petition as to ground three.

### CONCLUSION

The Court concludes that July has not made the necessary showings to obtain federal habeas relief under 28 U.S.C. § 2254. The Court therefore denies the petition as to all three grounds for relief raised therein. However, because the Court concludes that reasonable jurists could debate whether claim three states a substantial constitutional claim and could debate the Court's determination that relief on that claim is barred by an adequate and independent state procedural rule, the Court grants a certificate of appealability on the issue of whether the rule announced by the Oklahoma Court of Criminal Appeals in *State ex rel. Matloff v. Wallace*, 497 P.3d 686 (Okla. Crim. App. 2021), is an independent and adequate state procedural rule that bars relief as to Patterson's claim that he was denied due process when the State of Oklahoma exercised criminal jurisdiction to prosecute him for crimes he committed in Indian country. 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

---

[14] As previously stated, July did not file an optional reply brief to respond to any arguments Respondent raised in the response. Further, after the Court granted Respondent's motion file a supplemental brief addressing the *Fitzer* decision, *see supra* n.13, and provided July the opportunity to also file a supplemental brief addressing the *Fitzer* decision, July did not file a supplemental brief.

**IT IS THEREFORE ORDERED** that:

1. the Clerk of Court shall note on the record the substitution of Scott Tinsley, Interim Warden, in place of Janet Dowling as party respondent;

2. the petition for writ of habeas corpus (Dkt. 1) is **denied**;

3. a certificate of appealability is **granted** on the following issue: whether the rule announced by the Oklahoma Court of Criminal Appeals in *State ex rel. Matloff v. Wallace*, 497 P.3d 686 (Okla. Crim. App. 2021), is an independent and adequate state procedural rule that bars relief as to July's claim that he was denied due process when the State of Oklahoma exercised criminal jurisdiction to prosecute him for crimes he committed in Indian country; and

4. a separate judgment shall be entered in this matter.

**DATED** this 19th day of September, 2025.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE